FILED

SEP 29 2021

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 4:21CR00539 RWS/JMB |
| v. ) | |
| ) | |
| ) | |
| MICHAEL J. MCCORMAC, ) | |
| ) | |
| Defendant. ) | |

**INDICTMENT**

The Grand Jury charges that:

**Introduction**

1. At all times relevant to this Indictment, Defendant Michael J. McCormac ("Defendant McCormac"), a resident of the county of St. Louis, Missouri, was the owner and operator of GoLiveWell Pharmacy, LLC ("GoLiveWell").

2. Between on or about March 17, 2017 and on or about November 30, 2019, GoLiveWell was a pharmacy located at 13035 Olive Boulevard, Suite 210, Creve Coeur, Missouri 63141 in the Eastern District of Missouri. GoLiveWell primarily functioned as a mail-order pharmacy, and it filled prescriptions for federal health insurance beneficiaries throughout the United States.

3. At all times relevant to this Indictment, Defendant McCormac as an individual, and/or through his pharmacy GoLiveWell, submitted and caused to be submitted reimbursement claims to various health insurers, including but not limited to Medicare, the Missouri Medicaid program, and the Ohio Medicaid program.

## Background

### Relevant Medicare Provisions

4. The United States Department of Health and Human Services, through Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. Medicare is a "health benefit program" as defined by Title 18, United States Code, Section 24(b)(2), and referenced in Title 18, United States Code, Section 1347.

5. Medicare is subdivided into multiple "Parts." Medicare Part D provides prescription drug coverage to Medicare beneficiaries enrolled in Medicare Part D. Part D was enacted as part of the Medicare Prescription Drug Improvement and Modernization Act of 2003. Part D is administered by private insurance plans that are reimbursed by Medicare through CMS.

6. Under Part D, a pharmacy can contract directly with Part D Plans or with Pharmacy Benefit Managers ("PBMs"). Under either arrangement, the pharmacy submits claims for prescriptions filled for Medicare Part D beneficiaries. Most Part D Plans contract with a PBM to administer processing and payment for prescription drug claims.

7. Typically, a Medicare beneficiary enrolled in a Part D Plan obtains his/her prescriptions from a pharmacy authorized by the beneficiary's Part D Plan. After filling a beneficiary's prescription, the pharmacy can submit the prescription drug claim to the Part D Plan or PBM. Each Part D Plan submits to CMS a record of each prescription drug claim it receives from a pharmacy.

### Relevant Missouri Medicaid Provisions

8. Medicaid is a federal health benefit program for low-income or disabled individuals, which is jointly funded by the states and the federal government. Similar to Medicare,

it is a "health benefit program" as defined by Title 18, United States Code, Section 24(b)(2), and referenced in Title 18, United States Code, Section 1347. Medicaid is primarily administered by agencies within the various state governments, and at the federal level by CMS. Similar to Medicare, Medicaid has a prescription drug benefit.

9. MO HealthNet, which is an agency within the Missouri Department of Social Services ("DSS"), administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income or disabled Medicaid recipients.

10. A Medicaid provider must enter into a written agreement with DSS to receive reimbursement for medical services provided to Medicaid recipients and must agree to abide by DSS's regulations in rendering and billing for those services. The MO HealthNet Pharmacy Program reimburses pharmacies, which provide covered drugs and other medical supplies to MO HealthNet recipients.

11. The MO HealthNet Pharmacy Program requires that all prescriptions for eligible participants be filled in accordance with Missouri statutes regulating pharmacies and pharmacists.

12. Section 2.6 of the MO HealthNet Pharmacy Manual defines Fraud and Abuse. Fraud is defined as "intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to him or herself or some other person. It includes any act that constitutes fraud under applicable Federal and State laws, regulations and policies." Abuse is defined as "provider, supplier, and entity practices that are inconsistent with sound fiscal, business, or medical practices, and result in an unnecessary cost to the Medicaid program, or in reimbursement for services that are *not* medically necessary or that fail to meet professionally recognized standards for health care. It also includes participant

practices that result in unnecessary costs to the Medicaid program." Frequently cited fraudulent or abusive practices include, but are *not* limited to, "overcharging for services provided, charging for services *not* rendered, accepting bribes or kickbacks for referring patients, and rendering inappropriate or unnecessary services."

### Relevant Ohio Medicaid Provisions

13. In Ohio, Medicaid recipients are enrolled in managed care organizations ("MCOs"). An MCO is a health care provider or group of medical service providers who offer managed care health plans. Medicaid managed care provides for the delivery of Medicaid health benefits through contracted agreements between the State and the MCOs. CareSource is one such MCO in Ohio. CVS/Caremark is the PBM for all Ohio Medicaid MCO plans relevant to this Indictment.

### Relevant Telemedicine Requirements

14. Telemedicine, also referred to as telehealth medicine, is the use of information technology by doctors and other authorized health care providers to provide clinical health care from a distance. Telemedicine includes, but is not limited to, real-time audio or video communication between patients in one location and the doctor or authorized health care provider in another location. In all instances, telemedicine doctors or other authorized health care providers are required to conduct an evaluation and assessment sufficient to determine the patients' medical needs before prescribing or ordering any service or product, including medications.

### Federal Anti-Kickback Statute

15. Compliance with the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

4

16. The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program. Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

17. Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing or referring patients for health care services.

### Medical Necessity Requirement

18. Medicare, as with virtually all forms of public and private insurance, will only pay for services and devices that are medically necessary. The Medicare Benefit Policy Manual, Chapter 16, Section 20 describes generally what items and services are excluded from coverage by the Medicare program. This section of the Manual states, in part, "Items and services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member are not covered."

### GoLiveWell Pharmacy's Agreements With PBMs

19. As a pharmacy, GoLiveWell was required to enter into a provider agreement with plans or Pharmacy Benefits Managers ("PBMs") that administer health insurance plans, with which it wanted to do business. PBMs administered claims for various federal health insurers, including but not limited to Medicare Part D, Missouri Medicaid, and Ohio Medicaid. Defendant McCormac, on behalf of GoLiveWell, signed provider agreements with multiple plans and PBMs,

such as CVS/Caremark, Optum Rx, Express Scripts, Inc, and Humana. In those agreements, Defendant McCormac generally agreed to comply with applicable Federal and State Laws.

20. For example, on or about July 7, 2017, Defendant McCormac signed on behalf of GoLiveWell an agreement with CVS/Caremark titled the CareMark Provider Agreement. The "Compliance with Law" provision stated:

> Provider will comply with all applicable Laws, including but not limited to those Laws referenced in the Federal and State Laws and Regulations section (and attached Addendums thereto) set forth in the Provider Manual.

21. The laws referenced in the CVS/Caremark Provider manual include but are not limited to the Anti-Kickback Statute, Stark Law, and Caremark Compliance Program.

22. Similarly, on or about November 13, 2018, Defendant McCormac, on behalf of GoLiveWell, entered into a Pharmacy Provider Agreement with Humana. The "Compliance with Law" provision of that Agreement states:

> Provider shall comply and shall require Participating Pharmacies and all Pharmacists employed by or under contract with Provider and/or Participating Pharmacies to comply, with all federal, state, local, ordinances, orders, rules and regulations, and CMS instructions that are applicable to the provision of Pharmacy Services under terms and conditions of this Agreement.

23. Pursuant to the Pharmacy Provider Agreement, Defendant McCormac also agreed to ensure that all employees had completed fraud, waste and abuse training:

> (i)…including but not limited to, laws addressing fraud, waste and abuse, and regulations related to gifts and gratuities for government employees; (ii) review of significant federal fraud, waste and abuse laws, including, but not limited to, the False Claims Act and the Anti-Kickback Statute; (iii) review types of fraud, waste and abuse involving beneficiaries, providers and Medicare Advantage and/or Part D Plans; and (iv) review of process for reporting suspected fraud or abuse to government authorities.

24. Humana also required Defendant McCormac to fill out a "Participating Pharmacy Information Form." In that form, Defendant McCormac certified that GoLiveWell had a

compliance policy, standards of conduct, and fraud, waste, and abuse detection, correction and prevention training consistent with Humana's policies, standards, and training.

## Count 1
## Health Care Fraud Scheme
## 18 U.S.C. §§ 1347 and 2

25.  Paragraphs 1 through 24 are incorporated by reference as if fully set out herein.

26.  Beginning in or about February 28, 2018 through November 30, 2019, Defendant McCormac willfully executed and attempted to execute a scheme and artifice to defraud a health care benefit program, in connection with delivery of or payment for health care benefits, items, or services as described below.

GoLiveWell Pharmacy

27.  Defendant McCormac incorporated GoLiveWell on or about March 17, 2017. At all times relevant to the Indictment, he was the owner and manager of GoLiveWell. Defendant McCormac ran GoLiveWell's day-to-day business operations, including but not limited to communicating with and obtaining business from purported marketing companies that referred business to GoLiveWell.

28.  As described in Paragraphs 1 through 24 above, Defendant McCormac enrolled GoLiveWell with various health insurers, including federal health insurers and PBMs that worked with federal health insurers. In GoLiveWell's agreements with each insurer, Defendant McCormac certified that GoLiveWell would comply with applicable federal and state laws. Certain agreements, such as GoLiveWell's agreements with Humana, required Defendant McCormac to certify that GoLiveWell would train its employees on fraud, waste and abuse laws, including but not limited to the False Claims Act and the Anti-Kickback Statute. Having received such training, Defendant McCormac knew it was illegal to solicit, offer, pay, or receive kickback

7

payments in exchange for referring patients, items and services which were to be reimbursed by Medicare or Medicaid.

29. A large portion of claims GoLiveWell submitted to federally funded health insurance plans included expensive topical creams, oral medications, and antibiotic and antifungal drugs referred to as "foot bath" drugs.

30. The topical creams and oral medications purportedly were prescribed for a variety of conditions such as dry skin, pain and muscle spasms. Those drugs included but were not limited to doxepin hydrochloride (local anesthetic), clobetasol propionate (corticosteroid), lidocaine (local anesthetic), dihydroergotamine mesylat (nasal spray), fluocinonide (corticosteroid), hydrocortisone (corticosteroid), diclofenac sodium (topical NSAID), chlorzoxazone (oral muscle relaxant), and dermacin prizopak (local anesthetic).

31. The "foot bath" drugs were prescribed purportedly to treat a variety of foot infections and foot pain. Medicare and Medicaid beneficiaries received a plastic foot spa (a "foot bath"), free of charge, and an expensive cocktail of drugs, including oral antibiotic capsules, bottles of antibiotic solution, and tubes of antifungal cream. GoLiveWell instructed the beneficiaries to mix the capsules and the solution with warm water to soak their feet, then to apply the antifungal cream afterward. The foot bath drugs included but were not limited to Vancomycin capsules, Clindamycin 1% solution, and Ketoconazole 2% cream.

<u>Defendant McCormac Paid Marketing Companies Kickbacks For Referrals</u>

32. It was part of the scheme and artifice to defraud that Defendant McCormac, on behalf of GoLiveWell, contracted with purported marketing firms to identify "patients" for GoLiveWell. Defendant McCormac was aware that the marketing companies used one or more tactics including (1) direct marketing to physicians' offices; (2) faxing a prescription, unsolicited,

8

to the beneficiary's actual doctor, a process referred to as "doctor chase"; and (3) running advertisements to attempt to get patients to "opt in" to receiving prescriptions for various drugs, including but not limited to expensive topical creams and foot bath drugs. When a patient responded to the advertisement, they would receive a call collecting pertinent personal information, including their health insurance information, and attempting to get the patient to confirm that they wanted the medication.

33. It was further part of the scheme and artifice to defraud that Defendant McCormac knew some of the marketing companies would obtain a prescription for the drugs from a telemedicine doctor with no prior treating relationship with the patient. In many cases, the telemedicine doctor did not communicate directly with the patient and/or did not evaluate the patient to assess his/her need for the drugs.

34. It was further part of the scheme and artifice to defraud that Defendant McCormac, on behalf of GoLiveWell, procured leads through various marketing companies, including but not limited to Marketing Company LST, Marketing Company MM, Marketing Company HPS, Marketing Company HM, and others. In exchange for the leads, or prescriptions, referred to GoLiveWell, Defendant McCormac agreed to pay the marketing companies various percentages of the net profit or "margin," on each prescription. For example, Defendant McCormac paid Marketing Company LST approximately 65 percent of GoLiveWell's margin, Marketing Company MM approximately 60 percent of GoLiveWell's margin, Marketing Company HPS approximately 45 percent of GoLiveWell's margin, and Marketing Company HM approximately 45 percent of GoLiveWell's margin. Defendant McCormac and other GoLiveWell employees kept spreadsheets tracking payments to the various marketing companies.

35. It was further part of the scheme and artifice to defraud that Defendant McCormac instructed GoLiveWell employees to keep track of which prescriptions came from which marketing groups by stamping the name of the marketing company on the prescription.

36. It was further part of the scheme and artifice to defraud that, knowing it was illegal to pay marketing companies for referrals, Defendant McCormac structured contracts and invoices falsely to reflect an hourly rate for "marketing" services in order to conceal the true nature of the payment. For example, on or about February 12, 2019, Defendant McCormac, through GoLiveWell, invoiced Marketing Company HPS for 1,043.34 hours of purported marketing services. Defendant McCormac's corresponding GoLiveWell spreadsheet tracking payments to Marketing Company HPS for that same month indicates that on or about February 12, 2019, Marketing Company HPS was paid approximately $260,836.06. The $260,836.06 amount was 45 percent of GoLiveWell's $579,635.79 margin (after shipping costs had been subtracted).

<u>Defendant McCormac Knowingly Sought Reimbursement for Providing Medically Unnecessary Drugs Prescribed By A Physician With No Treatment Relationship To The Patient</u>

37. At all times relevant to this Indictment, Defendant McCormac knew that GoLiveWell employees called patients prior to sending out prescriptions, including for topical creams and foot bath drugs. The purpose of these calls was to have a record that the beneficiaries had confirmed they wanted to receive the drugs. Many of those calls were recorded and maintained by GoLiveWell.

38. It was part of the scheme and artifice to defraud that, as Defendant McCormac knew, patients often made statements to GoLiveWell employees during these telephone calls that demonstrated that the patients did not have a valid doctor/patient relationship with the provider who signed the prescription, such as:

   a. Patients stating that they were confused as to why they were being called or why they were receiving the drugs;

   b. Patients stating that they did not want or need the drugs;

   c. Patients not recalling speaking with the telemedicine provider who had prescribed the drug.

Despite these statements by the patients, GoLiveWell submitted claims for prescriptions discussed during these patient calls.

39. It was part of the scheme and artifice to defraud that, as Defendant McCormac was aware, GoLiveWell also received calls from providers inquiring as to how their patients obtained prescriptions from GoLiveWell from another provider their patient did not recognize, and from providers who stated that they were aware GoLiveWell had submitted claims for prescriptions containing their names but which they did not sign.

40. It was further part of the scheme and artifice to defraud that, when GoLiveWell employees who had spoken with patients on the phone asked Defendant McCormac if the prescriptions were legitimate, he falsely told the employees that they were.

41. It was further part of the scheme and artifice to defraud that Defendant McCormac was notified by various plans and PBMs of compliance issues and potential fraud similar to the issues identified by beneficiaries in the recorded calls. However, Defendant McCormac continued to pay illegal kickbacks to marketers for leads on prescriptions that GoLiveWell remained able to submit for federal health insurance reimbursement.

42. For example, on or about March 9, 2019, GoLiveWell received a letter from CVS/Caremark notifying its completion of an audit of GoLiveWell. The "audit comments" for several claims state: "Physician denied provide evidence of bona fide doctor-patient relationship."

43. On or about February 15, 2019, Defendant McCormac, as the pharmacy owner, received a letter from Humana, which terminated its agreement with GoLiveWell. One of the concerns leading to the termination was that "Humana has received member complaints regarding claims processed by Pharmacy, including complaints from members that they were not familiar with Pharmacy and never had prescriptions filled at Pharmacy."

44. On or about March 1, 2019, Defendant McCormac received a letter from OptumRx stating that it was terminating GoLiveWell for cause due to findings that "Members deny receipt of/request for medication services billed by Pharmacy" and "Prescriber denies...prescribing medications billed by Pharmacy."

45. It was further part of the scheme and artifice to defraud that on or about November 19, 2019, Defendant McCormac provided a signed written statement to the Missouri Board of Pharmacy, which requested that Defendant McCormac "Provide any names or businesses and contact information that GoLiveWell purchases or obtains lists of prescriptions from, sales work force that contact physicians or health care providers, marketing groups or Brokers that provide prescriptions to GoLiveWell Pharmacy." Defendant McCormac provided the following false and misleading statement in his written response: "GoLiveWell did not purchase or obtain lists of prescriptions from the Patient Advocates. GoLiveWell Pharmacy dispenses medications to patients upon receipt of prescriptions from health care providers (including telehealth health care providers) after a valid physician-patient relationship is established."

Defendant McCormac Knowingly Received Fraud Proceeds

46. As a result of the submission of claims for prescriptions that were fraudulent, Medicare paid at least $4,700,000 to GoLiveWell to which it was not entitled, Missouri Medicaid paid at least $490,000 to GoLiveWell to which it was not entitled, and Ohio Medicaid paid at least

12

$330,000 to GoLiveWell to which it was not entitled. Defendant McCormac received approximately $1,050,000 of the funds to which he was not entitled into his personal bank accounts, which he then deposited into his Morgan Stanley investment account.

Execution of the Fraud Scheme

47. On or about the dates listed below, in the Eastern District of Missouri, the defendant,

**MICHAEL J. MCCORMAC,**

knowingly and willfully executed and attempted to execute, the above-described scheme or artifice to defraud the listed health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendant submitted, and caused to be submitted, through his company GoLiveWell the below-listed reimbursement claims to federal health care benefit programs, based on prescriptions the Defendant obtained by paying marketing companies illegal kickbacks and/or that were not medically necessary.

| Beneficiary Initials | Prescriber Initials | Drug(s) | Date of Prescription | Date of Claim | Amount Paid to GoLiveWell | Insurer | Marketing Company |
|---|---|---|---|---|---|---|---|
| J.F. | J.G. | DermacinRx Prizopak | 6/11/2018 | 6/11/2018 | $5,035.69 | MO Medicaid | LST |
| A.A. | M.M. | Chlorzoxazone | 10/16/2018 | 10/16/2018 | $2,239.85 | OH Medicaid | MM |
| J.H. | S.M. | Vancomycin | 2/6/2019 | 2/8/2019 | $3,237.10 | Medicare | HPS |
| M.P. | T.B. | Vancomycin | 3/20/2019 | 3/20/2019 | $5,288.14 | Medicare | HM |
| S.H. | B.R. | Vancomycin | 1/31/2019 | 2/3/2019 | $3,239.25 | Medicare | HPS |

All in violation of Title 18, United States Code, Sections 1347 and 2.

**Count 2**
**Illegal Kickbacks for Referrals**
**42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2**

48. Paragraphs 1 through 47 are incorporated by reference as if fully set out herein.

49. On or about January 25, 2019, in the Eastern District of Missouri,

**MICHAEL J. MCCORMAC,**

the Defendant herein, did knowingly and willfully offer to pay remuneration (including a kickback, bribe and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to Marketing Company LST, to induce Marketing Company LST to purchase and order, to arrange for and recommend the purchasing and ordering, of a good and service, for which payment may be made in whole or in part under a federal program, in that the Defendant paid Marketing Company LST $4,130.46, including for the drug DermacinRx Prizopak supplied to MO Medicaid beneficiary A.F. pursuant to a prescription by M.A. on December 31, 2018, which was referred to GoLiveWell by Marketing Company LST.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

### Count 3
### Illegal Kickbacks for Referrals
### 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2

50. Paragraphs 1 through 47 are incorporated by reference as if fully set out herein.

51. On or about December 5, 2018, in the Eastern District of Missouri,

**MICHAEL J. MCCORMAC,**

the Defendant herein, did knowingly and willfully offer to pay remuneration (including a kickback, bribe and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to Marketing Company MM, to induce Marketing Company MM to purchase and order, to arrange for and recommend the purchasing and ordering, of a good and service, for which payment may be made in whole or in part under a federal program, in that the Defendant paid Marketing Company MM $34,053.31, including for the drug Chlorzoxazone supplied to OH Medicaid beneficiary D.B.

pursuant to a prescription by A.B. on October 26, 2018, which was referred to GoLiveWell by Marketing Company MM.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

### Count 4
### Illegal Kickbacks for Referrals
### 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2

52. Paragraphs 1 through 47 are incorporated by reference as if fully set out herein.

53. On or about February 5, 2019, in the Eastern District of Missouri,

**MICHAEL J. MCCORMAC,**

the Defendant herein, did knowingly and willfully offer to pay remuneration (including a kickback, bribe and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to Marketing Company HPS, to induce Marketing Company HPS to purchase and order, to arrange for and recommend the purchasing and ordering, of a good and service, for which payment may be made in whole or in part under a federal program, in that the Defendant paid Marketing Company HPS $166,312.50, including for the drugs Vancomycin, Clindamycin, and Ketoconazole supplied to Medicare beneficiary L.S. pursuant to a prescription by S.S. on January 30, 2019, which was referred to GoLiveWell by Marketing Company HPS.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

### FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Sections 1347 or 1320a-7b(b)(2)(B) as set

forth in Counts 1, 2, 3, and 4, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offenses.

2. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offenses.

3. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
MEREDITH L. REITER, #6325095(IL)
Assistant United States Attorney