AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

SEP **23** 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

The premises identified as GoLiveWell Pharmacy located at 13035 Olive Blvd, Suite 210, Creve Coeur, MO 63141.  (See Attachment A)

)
)
)
)
)

Case No.  4:19 MJ 6296 PLC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The premises identified as GoLiveWell Pharmacy located at 13035 Olive Blvd, Suite 210, Creve Coeur, MO 63141 (See Attachment A)

located in the _____ EASTERN _____ District of _____ MISSOURI _____ , there is now concealed *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Sections 371, 1341, 1343, 1347, 1349 | Conspiracy; Mail Fraud; Wire Fraud; Healthcare Fraud; Conspiracy to Commit Mail Fraud, Wire Fraud, and Healthcare Fraud |
| 42 U.S.C. Section 1320a-7b(b)(2)(A) | Anti-Kickback Statute |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael J. Badolato, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/23/19

Honorable Patrica L. Cohen, U.S. Magistrate Judge
*Judge's signature*

City and state:  St. Louis, MO

ANDREW J. LAY
*Printed name and title*

I, Michael J. Badolato, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND AND INTRODUCTION

1.       Affiant is a special agent with the Federal Bureau of Investigation (FBI), where affiant has been employed since April of 2002. While working for FBI, affiant has investigated alleged crimes against the United States, including healthcare related crimes. With the FBI, Affiant is assigned to the St. Louis Division. Affiant has a master's degree in Health Care Administration and a Bachelor of Science degree in Health Information Management from St. Louis University, St. Louis, MO, as well as a Master's of Business Administration from Lindenwood University, St. Charles, MO. Affiant received law enforcement training from the FBI Academy in Quantico, Virginia, and has received extensive training in conducting healthcare fraud investigations.

2.       I make this affidavit in support of an application for a search warrant to search the premises of **GoLiveWell Pharmacy, LLC.** (hereafter "GoLiveWell") which is located at 13035 Olive Boulevard, Suite 210, Creve Coeur, Missouri (MO) 63141, within the Eastern District of Missouri. 13035 Olive Boulevard is multi-business, standalone, two-story, tan building with stone accents. GoLiveWell is located on the second story in the center of the building at 13035 Olive Blvd., Suite 210. The building is located at the intersection of Olive Blvd. and Fernview Drive with a traffic light at the intersection. The business on the left of GoLiveWell is a business called "Dentist" and located in suite 214. There is no business to the right of GoLiveWell, while Creve Coeur Urgent Care is a business directly below GoLiveWell located on the first level of 13035 Olive Boulevard and residing in suite 115. The 13035 Olive Blvd. building has one (1) entrance in front of the building on the left side of the building. GoLiveWell has one large glass front door with the numbers 210 near the top of the door, with a GoLiveWell Pharmacy sign in the large window directly to the right of the glass entrance door, as pictured in Attachment A. There are a

1

total of four large windows to the right of GoLiveWell's glass door. GoLiveWell's space is divided

into three areas. The entrance to GoLiveWell has a single glass door, opening into the large center

room. Within the center room is the pharmacy, pharmacy counter, and inventory. There is a room

to the left where additional inventory is kept. Behind the pharmacy is the third area where an office

exists. This application seeks authority to search only the premises of 13035 Olive Blvd., Suite

210, for evidence of violations of 18 U.S.C. §§ 371 (conspiracy); 1341 (mail fraud); 1343 (wire

fraud); 1347 (healthcare fraud); 1349 (conspiracy to commit mail fraud, wire fraud, and healthcare

fraud); as well as violations of Title 42, United States Code, Section 1320a-7b(b)(2)(A (the Anti-

Kickback Statute).

3.      The facts in this affidavit come from my personal knowledge, my training and

experience, my review of documents, and information obtained from other agents and witnesses.

This affidavit is intended to show that there is sufficient probable cause for the requested warrant

and does not set forth all of the facts about this matter. Information provided by interviewees is in

substance.

### SCHEME OVERVIEW

4.      Medicare and Medicaid are federal health care benefit programs that cover certain

health related services including prescription drugs, as discussed further below. GoLiveWell

Pharmacy is participating in a scheme to pay bribes and kickbacks to marketing companies in

exchange for high cost "foot bath" prescription drug referrals for Medicare and Medicaid

patients. GoLiveWell subsequently submits false and fraudulent claims for payment to the

Medicare and Medicaid programs for medically unnecessary and expensive prescription drugs

such as Calcipotriene 0.005% cream, Vancomycin 250MG capsules, Clindamycin Phosphate 1%

2

solution, Ketoconazole 2% cream, and other prescriptions that it purportedly provides to Medicare and Medicaid beneficiaries.

     5.     GoLiveWell obtains this program-funded business by procuring customer "leads." Typically, a "lead" contains the name and other identifiers of a Medicare or Medicaid beneficiary, as well as a prescription from a medical provider for the drugs described above. GoLiveWell works with marketing companies, sometimes exclusively sometimes in conjunction with telemedicine companies, to obtain these leads. Both of these scenarios fit a pattern known to Affiant because of other similar investigations, both in the Eastern District of Missouri and nationwide. In the Eastern District of Missouri, in *In re Search of Integrity Medical*, Case No. 1:19 M 4099 ACL (Under Seal), the Court authorized a search warrant of Integrity Medical Supply regarding its payments to marketing companies for "leads" which included the individuals names, Medicare/Tricare numbers, and an "order" from a provider which purportedly prescribed and authorized orthotic braces for the individuals.  In a similar investigation within the Middle District of Florida (Case No. 8:15-cv-444-T-33TGW) and the Eastern District of Tennessee (Case No. 2:19-cr-133), those Courts authorized searches relating to allegations that the marketing companies (HealthRight, Health Savings Solutions, Vici Marketing, and Vici Marketing Group) fraudulently obtained insurance coverage information form consumers across the United States to arrange for them to receive prescription pain creams and other similar products, (2) these prescriptions were not medically necessary and did not arise from a valid doctor-patient relationship, and (3) the marketing companies sold these prescriptions to pharmacies under the guise of marketing services, and the payments solicited were based on the volume and value of the prescriptions.

6.      Marketing companies that sell leads typically obtain personal information of potential customers through advertising. The marketing companies make telephone contact with customers and encourage them to agree to receive prescriptions. The marketing companies either fax prescription requests to the potential customer's actual doctor or nurse practitioner (hereafter "providers"), or they provide the customer's information to a "telemedicine" company, which assigns a provider who purportedly contacts the potential customer.

7.      The claims submitted by GoLiveWell for the prescriptions associated with these "leads" are false and fraudulent for several reasons. In some cases, the prescription is not valid because the customer's health care provider, who purportedly authorized the script, did not actually authorize it. In other cases, the telemedicine provider does not have a real doctor/patient relationship with the customer before signing the prescription for the expensive drugs.  For example, multiple Medicare and Medicaid beneficiaries who received prescription drugs from GoLiveWell did not know the "prescribing" providers because these providers worked for telemedicine companies and were from other states. Neither the telemedicine companies nor the providers themselves bill Medicare or other insurance plans for any face-to-face office examinations or corresponding medical service for the prescription drug-receiving patients, during which the providers could have legitimately determined the need for any prescription medications. Telemedicine companies typically pay providers for each prescription they digitally sign. Some of these providers are responsible for large numbers of prescriptions for patients in multiple states.

8.      In still other instances, at least one provider known to the investigation who worked at a telemedicine company denied ever authorizing any prescriptions. GoLiveWell ultimately dispensed these drugs under this provider's name and billed them to Medicare.

9.      Finally, GoLiveWell's paying for leads constitutes a violation of the anti-kickback statute. Claims tainted by kickbacks are considered false claims by Medicare and Medicaid.

10.     In terms of organization, this affidavit starts by providing an overview of Missouri pharmacy regulation and health care program prescription drug payment policies from page 5-11. The affidavit at pp. 11-15 next discusses GoLiveWell's Medicare payment history while providing details on the pharmacy's top prescribers. Pages 15-22 discuss GoLiveWell's audit and overpayment history, demonstrating the pharmacy's awareness that many of the drugs claims that were submitted to health care programs were not covered or payable.  Pages 22-29 discuss interviews with local patients and former employees of GoLiveWell, and analyze the pharmacy's payments to various marketing companies.  Pages 29-37 discuss interviews with out of state patients and prescribers who are associated with GoLiveWell's prescription drug claims.

## REGULATIONS GOVERNING PHARMACIES IN MISSOURI

11.     The primary regulations that govern the operation of pharmacies in Missouri are found in two places, the Missouri Revised Statutes, (hereafter, "RSMO") and the Code of State Regulations (hereafter, "CSR"). Specifically, RSMO Chapter 338 contains laws pertaining to Pharmacists and Pharmacies, and Title 20 CSR, Division 2220 – Chapter 2 contains General Rules for the State Board of Pharmacy.

12.     Title 20 CSR 2220-2.018 Prescription Requirements states that in order for a prescription to be valid, it must contain the following information:

- The date of prescribing;
- The name of the patient;
- The prescriber's name;
- Name, strength, and dosage of the drug, device, or poison prescribed and the directions for use;
- The number of refills, if applicable;
- The quantity prescribed in weight, volume, or number of units;

5

- An indication of whether generic substitution has been authorized by the prescriber; and
- Any change or alteration made to the prescription dispensed based on contact with the prescriber to show a clear audit trail. This shall include, but is not limited to, a change in quantity, directions, number of refills, or authority to substitute a drug.

13.     RSMO 338.100 requires pharmacies to keep the original or order of each drug compounded or dispensed at the pharmacy for a period of not less than five years. This statute permits pharmacies to retain these records in hard copy form or an electronic facsimile containing the same information as a hard copy.

## RELEVANT MEDICARE PROVISIONS

14.     The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. Medicare is a "health care benefit program" as defined by Title 18 USC, Section 24(b)2 and referenced in Title 18 USC, Section 1347.

15.     Medicare is subdivided into multiple "Parts." Medicare Part D provides prescription drug coverage to Medicare beneficiaries enrolled in Medicare Part D. Part D was enacted as part of the Medicare Prescription Drug Improvement & Modernization Act of 2003. Part D is administered by private insurance plans that are reimbursed by Medicare through CMS. Medicare beneficiaries can obtain Part D benefits in two ways: (i) by joining a Prescription Drug Plan, which covers only prescription drugs, or (ii) by joining a Medicare Advantage Plan, which covers both prescription and medical services (collectively, "Part D Plans).

16.     Under Part D, a pharmacy can contract directly with Part D Plans, or with Pharmacy Benefit Managers (PBMs). Under either arrangement, the pharmacy submits claims for prescriptions filled for Medicare Part D beneficiaries. Most Part D Plans contract with a PBM to administer processing and payment of prescription drug claims.

6

17.     Typically, a Medicare beneficiary enrolled in a Part D Plan obtains his/her prescriptions from a pharmacy authorized by the beneficiary's Part D Plan. After filling a beneficiary's prescription, the pharmacy can submit the prescription drug claim to the Part D Plan or PBM. Each Part D Plan submits to CMS a record of each prescription drug claim it receives from a pharmacy. This record is commonly referred to as a Prescription Drug Event (PDE).

## RELEVANT MISSOURI MEDICAID PROVISIONS

18.     MO HealthNet, which is an agency within the Missouri Department of Social Services (DSS), administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income or disabled Medicaid recipients.

19.     A Medicaid provider must enter into a written agreement with DMS to receive reimbursement for medical services provided to Medicaid recipients and must agree to abide by DMS's regulations in rendering and billing for those services. The MO HealthNet Pharmacy Program reimburses pharmacies, which provide covered drugs and other medical supplies to MO HealthNet recipients. GoLiveWell is a Medicaid provider.

20.     The MO HealthNet Pharmacy Program requires that all prescriptions for eligible participants be filled in accordance with the Missouri statutes regulating pharmacies and pharmacists.

21.     As part of the claims submission process, certain information or "fields" are required to be submitted by the provider.  If required information is not submitted, MO HealthNet will reject the claim.  Among the fields required by MO HealthNet are: (1) the date the pharmacy dispensed the drug; (2) the identity of the pharmacy; (3) the identification of the prescribing physician, in the form of the prescriber's National Provider Identifier (NPI) number, Drug

Enforcement Administration (DEA) number and/or MO HealthNet provider number; (4) the MO HealthNet recipient number assigned to the recipient; (5) the National Drug Code (NDC) assigned to the particular drug dispensed; (6) the units of the drug dispensed and the time period of the prescription; (7) the number of refills authorized by the prescribing physician, and (8) the prescription number.

22.     Medicaid providers must retain, for five years from the date of service, fiscal and medical records that reflect and fully document services billed to Medicaid and must furnish or make the records available for inspection or audit by the DSS or its representatives upon request. Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in sanctions to the provider's participation in the Medicaid Program. This policy continues to apply in the event of the provider's discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

23.     Section 2.6 of the MO HealthNet Pharmacy Manual defines Fraud and Abuse. Fraud is defined as an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to him or herself or some other person. It includes any act that constitutes fraud under applicable Federal and State laws, regulations and policies.  Abuse is defined as provider, supplier, and entity practices that are inconsistent with sound fiscal, business, or medical practices, and result in an unnecessary cost to the Medicaid program, or in reimbursement for services that are *not* medically necessary or that fail to meet professionally recognized standards for health care. It also includes participant practices that result in unnecessary costs to the Medicaid program.  Frequently cited fraudulent or abusive practices include, but are *not* limited to, overcharging for services provided, charging for

services *not* rendered, accepting bribes or kickbacks for referring patients, and rendering inappropriate or unnecessary services.

## GOLIVEWELL'S COMMITMENTS TO CAREMARK AND OTHER PLANS/ PHARMACY BENEFITS MANUFACTURERS (PBM)

24.     A pharmacy, such as GoLiveWell, is required to sign a provider agreement with any of the plans and/or Pharmacy Benefits Manufacturers (PBM) that administer the plans, with which they want to do business. GoLiveWell signed provider agreements with multiple plans/PBS including: CVS/Caremark, Optum Rx, and Express Scripts, Inc. (ESI). Additionally, in signing the agreement, GoLiveWell received a provider manual for each plan and/or PBM.

25.     On or about November 7, 2017, GoLiveWell applied to be a CVS/Caremark provider by completing a Provider Agreement Application for pharmacy services. As reflected on the CVS/Caremark Provider Agreement, GoLiveWell Pharmacy (NPI ending in 18, and Tax ID number ending in 74) is physically located at 13035 Olive Boulevard, Suite 210, Creve Coeur, MO 63141. The business started at this location on March 17, 2017. The business structure is listed as a limited liability company (LLC). GoLiveWell's application identified Michael McCormac (McCormac) as the authorized agent.

26.     McCormac agreed that he and GoLiveWell will submit all claims for such Pharmacy Services electronically to CVS/Caremark in accordance with the CVS/Caremark Documents. Additionally, McCormac agreed that he and GoLiveWell will not waive, discount, reduce, or increase the patient payment amount indicated in the CVS/Caremark claims adjudication system unless otherwise authorized in writing by CVS/Caremark. Except for the collection of the applicable patient payment amount, in no event will provider seek compensation in any manner form an eligible person for pharmacy services with respect to a covered item.

27.     Further, in the agreement, McCormac and GoLiveWell agreed to comply with all applicable laws, including but not limited to those laws referenced in the Federal and State Laws and Regulations section set forth in the CVS/Caremark Provider Manual. This certification was signed by McCormac on July 7, 2017.

28.     One of the laws referenced in the CVS/Caremark Provider manual is the Anti-Kickback Statute, Stark Law, and Caremark Compliance Program.  In the agreement, McCormac and GoLiveWell certify that it shall not violate the federal anti-kickback statute, set forth at Title 42 U.S.C. 1320a-7b(b) ("Anti-Kickback Statute"), or the federal "Stark Law," set forth at 42 U.S.C. 1395nn ("Stark Law"), with respect to the performance of its obligations under this Provider Agreement.  In addition, CVS/Caremark's Code of Conduct and policies and procedures on the Anti-Kickback reads, "we comply with applicable federal and state anti-kickback laws and regulations. These laws prohibit payment or receipt of something of value intended to encourage purchasing, leasing or ordering of an item or service that may be reimbursed under a government health care program, such as Medicare or Medicaid." "Something of value" can take many forms, such as cash payments, entertainment, credits, gifts, free goods or services, the forgiveness of debt or the sale or purchase of items at a price that is not consistent with fair market value. It also may include the routine waiver of co-payments and/or co-insurance.

29.     OptumRx entered into a Pharmacy Network Agreement and a Provider Agreement with Pharmacy Services Administrative Organization (PSAO) , Health Mart Atlas on February 10, 2015. GoLiveWell is a contracted member of Health Mart Atlas, and as such must comply with the terms and conditions of the above referenced agreements between OptumRx

10

and Health Mart Atlas. As part of this contractual arrangement, GoLiveWell agreed to comply with all laws and regulations applicable to Medicare Part D.

<strong>Medicare Part D Summary Information</strong>

30.     For dates of service November 3, 2017 to July 26, 2019, GoLiveWell was paid approximately $3,919,918.33 for prescription drugs covered by Medicare Part D. The chart below shows significant differences in the amounts paid by Medicare to GoLiveWell from one month to another. These figures do not include claims that have been reversed by the Plans/PBMs pursuant to post-payment audits.  As such, GoLiveWell's total reimbursement could have been higher in certain months than is reflected here.

Medicare Part D Payments by Month

| Month | Part D Plan Paid Amt |
|-------|---------------------|
| Nov-17 | $6,490.99 |
| Dec-17 | $9238.11 |
| Jan-18 | $1,195.97 |
| Feb-18 | $5,604.00 |
| Mar-18 | $1,725.11 |
| Apr-18 | $1,208.74 |
| May-18 | $23,104.62 |
| Jun-18 | $68,060.95 |
| Jul-18 | $147,445.01 |
| Aug-18 | $250,632.22 |
| Sep-18 | $286,03951 |
| Oct-18 | $253,694.47 |
| Nov-18 | $223,302.89 |
| Dec-18 | $302,609.82 |
| Jan-19 | $220,346.83 |
| Feb-19 | $627,138.03 |
| Mar-19 | $434,877.54 |
| Apr-19 | $810,744.49 |
| May-19 | $109,003.04 |
| Jun-19 | $83,818.14 |
| Jul-19 | $53,637.85 |
| **Total** | **$3,919,918.33** |

31.     The following tables represents the drugs paid for by Part D plans at GoLiveWell since the pharmacy opened for business, and the drugs paid for by Part D plans since the start of 2019, in order. Of note is that all the paid claims for Vancomycin occur after the start of 2019. As reflected below, Vancomycin accounts for approximately 81% of the pharmacy's total reimbursement for 2019. Affiant is aware of Vancomycin, as well as Clindamycin and Ketaconazole being dispensed together as part of a "foot bath" treatment, as described later in this Affidavit. The three of these drugs combined represent approximately 92% of GoLiveWell's total Part D reimbursement since the start of 2019 and represent the principle financial driver of the pharmacy's business.

32.     Additionally, a dramatic shift in the drugs the pharmacy dispenses to Part D customers takes place following the start of 2019. Reimbursement for virtually all other products that had been significant sources of reimbursement during 2018 drop dramatically at this point. Examples of this pattern include, Calcipotriene, which accounted for over $450,000 in reimbursement from 2017 – 2018 and represented the largest driver of revenue for GoLiveWell during the time prior to the start of 2019, and Doxepin.

12

Part D Plan Payments by Drug Name – July 2017 – July 2019

| Drug Name | Part D Plan Paid Amount |
|---|---|
| VANCOMYCIN HCL 250 MG CAPSULE | $1,896,004.13 |
| CALCIPOTRIENE 0.005% CREAM | $504,659.10 |
| DOXEPIN 5% CREAM | $444,993.70 |
| CLINDAMYCIN PH 1% SOLUTION | $191,367.40 |
| CLOBETASOL 0.05% OINTMENT | $143,039.32 |
| FLUOCINONIDE 0.1% CREAM | $115,728.35 |
| LIDOCAINE 5% OINTMENT | $111,456.81 |
| HYDROCORTISONE 1% ABSORBASE | $109,951.36 |
| DIHYDROERGOTAMINE MESYLATE 4 MG/ML NASAL SPRAY | $107,207.75 |
| DICLOFENAC SODIUM 3% GEL | $74,348.48 |
| KETOCONAZOLE 2% CREAM | $68,917.61 |
| CHLORZOXAZONE 250 MG TABLET | $68,229.48 |
| DICLOFENAC 1.5% TOPICAL SOLN | $21,205.21 |
| CLOBETASOL 0.05% CREAM | $20,910.88 |
| TRIAMCINOLONE 0.147 MG/G SPRAY | $12,837.05 |
| *ALL OTHER DRUGS COMBINED* | *$29,061.70* |
| **Total** | **$3,919,918.33** |

Part D Plan Payments by Drug Name & Expressed as Percentage of Total (January – July 2019)

| Drug Name | Total Part D Plan Paid | % of Total |
|---|---|---|
| VANCOMYCIN HCL 250 MG CAPSULE | $1,896,004.13 | 81.04% |
| CLINDAMYCIN PH 1% SOLUTION | $190,645.58 | 8.15% |
| KETOCONAZOLE 2% CREAM | $68,917.61 | 2.95% |
| CALCIPOTRIENE 0.005% CREAM | $39,665.46 | 1.70% |
| DOXEPIN 5% CREAM | $31,660.65 | 1.35% |
| *ALL OTHER DRUGS COMBINED* | *$112,672.49* | *4.81%* |
| **Grand Total** | **$2,339,565.92** | **100.00%** |

33.     The following table represents a summary of the total amounts paid to

GoLiveWell since January 1, 2019, ranked by the ten (10) prescribing providers responsible for

the largest volume of prescription payments, as well as the prescribing provider's state according

to the claims data. The table summarizes the total paid by Part D for all drugs as well as the

amount paid only for the foot bath drugs.

13

Summary of Top 10 Prescribing Providers since 1/1/2019

| Prescriber Name | Part D Paid Amount | Part D Paid Amount re: Foot Soak Drugs |
|---|---|---|
| Nichole Jeanette Pridemore (GA) | $139,339.75 | $139,273.41 |
| Yulanda T Faison- Oyebanji (FL) | $107,318.20 | $107,181.08 |
| Kelly  Bowman (TX) | $104,337.67 | $104,183.89 |
| Ingrid  Estephan (MN) | $103,497.87 | $102,461.10 |
| Michael D Boswell (NC) | $96,887.94 | $96,887.94 |
| Shannon  Haas (LA) | $84,765.79 | $84,765.79 |
| Beth Anne Robinson (NM) | $80,713.54 | $80,427.80 |
| Jennifer Jane Hook (IA) | $56,918.35 | $56,877.53 |
| Michael D LaRochelle (MS) | $56,093.45 | $56,093.45 |
| Anurag  Mishra (TX) | $53,626.18 | $53,626.18 |
| **Total Paid – Top 10 Prescribers** | **$883,498.74** | **$881,778,17** |

34.    The following table represents the States of residence for the Medicare

beneficiaries for whom GoLiveWell dispensed drugs from July 2017 – July 2019.

Summary by Medicare Beneficiary State of Residence

| State | Part D Plan Paid Amount |
|---|---|
| FL | $442,473.36 |
| GA | $403,862.12 |
| NC | $376,918.95 |
| IL | $346,248.01 |
| NY | $313,592.40 |
| KY | $264,770.67 |
| MO | $248,545.89 |
| OH | $237,836.71 |
| MS | $215,040.73 |
| TX | $144,252.73 |
| *All other States Combined* | *$926,376.76* |
| **Total** | **$3,919,918.33** |

14

## Audits Performed by Pharmacy Benefit Managers

### CVS/Caremark Audit

35.     GoLiveWell enrolled in the CVS/Caremark network on 7/10/2017, but submitted

a relatively small volume of claims, and received less than $5,000 per month in reimbursement

through April 2018. At that point, CVS/Caremark noticed a trend of GoLiveWell submitting

high dollar creams, ointments and other high dollar items. The table below summarizes the claim

activity and reimbursement received by GoLiveWell for claims submitted to the CVS/Caremark

network from September 2017 through September 2018.

| Month | # of Scripts | Total Amt Paid |
|-------|-------------|----------------|
| September 2017 | 1 | $200.16 |
| October 2017 | 0 | $0.00 |
| November 2017 | 5 | $4,052.26 |
| December 2017 | 3 | $4,224.24 |
| January 2018 | 0 | $0.00 |
| February 2018 | 3 | $4,244.24 |
| March 2018 | 2 | $2,116.00 |
| April 2018 | 2 | $2,372.34 |
| May 2018 | 36 | $27,958.83 |
| June 2018 | 60 | $83,490.33 |
| July 2018 | 236 | $349,934.13 |
| August 2018 | 355 | $414,937.11 |
| September 2018 | 449 | $450,965.40 |

36.     CVS/Caremark initiated an audit based on these trends and due to a complaint

from one of its member plans. The audit period was September 1, 2017 through September 1,

2018. During that time, CVS/Caremark paid GoLiveWell approximately $1,335,905.

CVS/Caremark determined that GoLiveWell had only billed CVS/Caremark for 63 unique items

during the audit period, but that the top 10 items constituted 91% ($1,217,144) of the

reimbursement. The most lucrative product for GoLiveWell was Calcipotriene Cream 0.005%.

GoLiveWell received $388,655 for 280 claims during the audit period. This constitutes an

average of approximately $1,388 per claim/prescription. Other expensive products during the

15

audit period included Doxepin HCL Cream 5%, which reimbursed at approximately $1,500 per claim, and Fluocinonide Cream 0.1%, which reimbursed at approximately $2,135 per claim.

37.     CVS/Caremark notified GoLiveWell about the audit on October 4, 2018.

38.     On November 7, 2018, CVS/Caremark sent prescription verification letters to approximately 153 providers related to drugs purportedly dispensed by GoLiveWell. Of the 153, 36 responded.

39.     Of the 36 responses, 8 providers clearly indicated that they prescribed all the drugs listed to the patient(s) in question. 9 of the responses were inconclusive, as follows: 2 indicated that the provider in question was not at the location to which the verification was sent; 6 were signed by the provider, but they did not clearly indicate if the provider actually prescribed the medication; and 1 response indicated that the prescribing provider left the practice prior to the date the prescription was purportedly authorized.

40.     19 of the responding providers denied prescribing some or all of the drugs in question. CVS/Caremark determined that 94 prescriptions and subsequent refills associated with "prescriber denials" constituted "discrepant" claims, and they requested repayment. GoLiveWell appealed this determination.

41.     As part of the appeal, GoLiveWell supplied additional records to CVS/Caremark related to these discrepancies. For all of these discrepancies, CVS/Caremark asked the pharmacy to provide "evidence of doctor-patient relationship," for example, chart notes, exam notes and other medical records, as well as validations of the prescriptions prescribed including the time, place, and means of interaction with the patient by the provider.

42.     GoLiveWell supplied records, and in every instance, there appeared to be a signed prescription from the provider. However, CVS/Caremark determined that the supplied

documentation was not sufficient to reverse their prior determination, so GoLiveWell lost its appeal as it related to 93 of the 94 previously identified claims. On at least one of these, the signature on the prescription supplied by GoLiveWell appears dramatically different from the signature on the prescriber verification letter submitted to CVS/Caremark by Dr. K.B. on November 7, 2018.

43.     CVS/Caremark reviewed hard copy records supplied by GoLiveWell pursuant to their appeal request. Among these records were prescriptions, which CVS/Caremark described as "exactly the same pre-printed templates." These templates show various fax numbers in the headers, which identify the numbers from which the documents were faxed to the prospective prescribers. The most commonly observed fax number is 888-215-5696, which is not the fax number at GoLiveWell. Based on CVS/Caremark's observations, as well as Affiant's research, this number does not appear to be linked to the prescribing providers either. Based on my understanding of this scheme and other similar schemes, 888-215-5696 is likely to be the number of a marketing company that was trying to collect "leads" that it would later sell to pharmacies like GoLiveWell.

44.     CVS/Caremark conducted an audit exit interview with McCormac on December 3, 2018. During the interview, Auditor J.T. asked McCormac "if he was using Telemed for his prescriptions. Mike [McCormac] stated that they were using two different types, a brick and mortar telemed and an online telemed by the name of 'Pro something'."

45.     On December 5, 2018, CVS/Caremark notified GoLiveWell of their initial audit findings, in which they determined that they had overpaid GoLiveWell approximately $258,107 for "discrepant claims." The discrepancies included the above referenced prescriber denials, failure to collect copays in 82 instances, as well as some inventory discrepancies. GoLiveWell

17

appealed this determination, and as described above, supplied supporting documentation to CVS/Caremark. On March 19, 2019, CVS/Caremark issued their final determination, and determined that GoLiveWell owed CVS/Caremark approximately $234,063 for discrepant claim filings.

**OptumRx Audit**

46.     OptumRx routinely performs audits of pharmacies within its provider network to identify fraud, waste, and abuse. OptumRx completed an audit of GoLiveWell on February 21, 2019. On March 1, 2019 OptumRx issued an initial findings letter notifying GoLiveWell that they were terminating GoLiveWell from the network because OptumRx members denied receipt of/request for medication services billed by GoLiveWell, and because prescribers denied prescribing medications billed by GoLiveWell.

47.     On March 6, 2019, Amy Krenski (Krenski) a pharmacist at GoLiveWell, sent an appeal request to OptumRx, which included the contact email address of info@golivewellpharm.com.

48.     On April 5, 2019, OptumRx notified GoLiveWell of their final findings, denying their appeal. GoLiveWell appealed that determination as well. GoLiveWell submitted documentation to OptumRx related to specific prescription numbers. Ultimately, OptumRx determined that the documentation described below submitted by GoLiveWell was not sufficient to reverse their findings and notified the pharmacy of an overpayment of approximately $50,237.

49.     Included in this documentation were typed reports provided by what appears to be a third-party, "RXD," related to three (3) OptumRx members, R.L., L.W., and S.B. Based on my understanding of this scheme and other similar schemes, RXD is likely to be the marketing company that sold "leads" regarding OptumRx members, R.L., L.W., and S.B. to GoLiveWell.

18

50.     The RXD reports identify the OptumRx member by name and identify the provider who purportedly had already provided a prescription. In two of the three instances, the reports detail a conversation with the member. The third report details a conversation with a receptionist in the office of Dr. S.K, regarding member S.B.. The reports are not dated or signed. They do not list a telephone number from which the call originated or a telephone number to which the call was placed. The reports do not indicate a name for the caller from "RXD," only identifying the individual as "RXD agent."

51.     According to the RXD report obtained by OptumRX, RXD contacted Dr. S.K.'s office regarding a prescription for S.B. and spoke with Ashley at the front desk. The RXD agent wanted Dr. S.K.'s office to sign an acknowledgment that the doctor had signed the script and fax it back to RXD. Ashley told the RXD agent that the doctor did not recall approving the script and would not sign or send anything to RXD until the office completed their internal review of the situation.

52.     According to the RXD report obtained by OptumRX, RXD contacted R.L. regarding a prescription from Dr. [G] for "pain and skin repair cream." The RXD agent told R.L. that RXD would send the prescription to "the pharmacy," but R.L. wanted to know the purpose of the prescription. RXD advised it was related to pain and skin repair cream. During the phone call, the RXD agent confirmed R.L.'s address, phone number, date of birth, the last 4 of his Social Security Number, and the status of his insurance. The RXD agent advised R.L. that the phone call was being recorded "for quality assurance purposes." R.L. told the RXD agent that he did not want the prescription auto refilled because he "does not know how much of it he will be using."

53.     According to the RXD report obtained by OptumRX, RXD contacted L.W. regarding a signed prescription from L.W.'s physician's assistant (PA), S.J. for "topical pain and skin repair cream." The RXD agent told L.W. that they were sending the prescription to "the pharmacy." L.W. asked what the prescription was for, and was told it was for "her pain and skin repair, for dermatitis, scarring, eczema, etc." L.W. told the RXD agent she does not take pain medication. The RXD agent told L.W. the prescription was for a non-narcotic pain cream for joint pain, arthritis, general aches and pains. During the course of the call, L.W. advises that she has "aches and pains from head to toe."

54.     L.W. told the RXD agent she was confused and asked from where the call originated because she did not want to change pharmacies. The RXD agent told her that this prescription was from a specialty pharmacy, and the rest of her drugs would continue to come from her regular pharmacy.

55.     L.W. again asked why RXD was calling, and they told her that they were letting her know that a prescription was being sent to the pharmacy now. L.W. said "okay." During the course of the call, the RXD agent confirmed L.W.'s address.

56.     L.W. expressed concerns about providing her date or birth and insurance carriers, but ultimately told the RXD agent the information. She refused to provide the RXD agent with the last 4 of her Social Security Number.

57.     L.W. asked about the cost of the drugs. She told the RXD agent that she did "not want to pay anything" for the drugs. The RXD agent told her that they would contact her before sending anything out in the event there is a co-payment.

.

**Express Scripts Investigation**

58.     On April 23, 2019, ESI initiated an investigation of GoLiveWell. As part of the investigation, on April 24, 2019 ESI Pharmacy Investigator J.P. sent an email to GoLiveWell at the address, info@golivewellpharm.com. J.P.'s email requested that GoLiveWell provide an answer to several questions, including "Does the pharmacy utilize a Marketing Company."

59.     On April 26, 2019, "Amy" responded to J.P. from the above referenced email address. Amy's answer to the above question was "yes." Based upon information obtained during the course of the investigation from GoLiveWell employees, as described further, "Amy" is believed to be pharmacist Amy Krenski (Krenski).

60.     On April 26, 2019, J.P. requested that Krenski provide the name of the marketing company and the services they provide to GoLiveWell. Krenski responded the same day. The following is her response:

> "Their name is Invictus Ventures, LLC. They are a Florida limited liability company with physical address of 10801 Starkey Rd. Suit 104258, Seminole, FL 33777. You may contact Neil Williams at 727-698-5805.
>
> The marketing company works with several online publishers who place advertising and host websites, which allow patients to 'opt-in' and receive information. The patients are only called in response to inquiries they make to the advertisements and websites, where the patients provide their personal contact information and request to be called. There are no marketing materials, including any community outreach materials relating any Provider Agreement, Sponsor, PBM, Agency or Plan. There are no door to door, telephonic or other cold call marketing tactics, but rather online information allowing patients to request to be called. After speaking with the consumer who has opted in to be contacted, the patient may then be sent to their own physician or to a telemedicine provider, whichever the patient prefers. If the healthcare provider issues a prescription and the patient requests the name of a pharmacy to fill the prescription, the patient will be given a choice of several pharmacies including but not limited to GoLiveWell."

**St. Louis Investigation by FBI & HHS-OIG**

61.     On June 11, 2019, a special agent with the St. Louis HHS-OIG interviewed S.T., a Medicare beneficiary, living in St. Louis, Missouri (MO). S.T. received a foot bath and some medication in the mail a few months prior. S.T. could not recall the details, bur remembered receiving a telephone call from someone prior to receiving the package. S.T. did not recall being asked if she wanted the products, but rather was told by caller that she would be receiving the products. The caller had all of S.T.'s identifiers including her Medicare number.

62.     S.T. denied ever hearing about GoLiveWell. S.T. uses Beverly Hills Pharmacy located in St. Louis which delivers to her home. S.T. has never heard of a medical provider by the name of Jessica Bruns. S.T.'s primary care physician is Matthew Gibfield and she occasionally receives treatment at St. Louis University Hospital. Medicare claims data confirm Jessica Bruns prescribed "foot bath" drugs to S.T. Further, GoLiveWell dispensed the drugs and billed Medicare for them. S.T. said that she received foot bath packages in March 2019 and on June 13, 2019.

63.     As described in more detail in subsequent paragraphs, K.L. a former APRN at Telemedicine Company 1 provided an email to agents from the Hartford office of the HHS-OIG. K.L. she received the email from K.C. at Telemedicine Company 1. The distribution list on the email included health care provider and prescriber Jessica Bruns.

64.     On June 18, 2019, a special agent with the St. Louis HHS-OIG interviewed L.S., a Medicare beneficiary, living in St. Louis, MO. In February 2019, L.S. received a package in the mail from GoLiveWell containing a foot bath and prescription medication.  L.S. did not recall speaking with anyone from GoLiveWell nor speaking with anyone regarding foot soaks and/or prescription medication for the foot soaks.  In early June 2019, L.S. received a telephone call from

an unknown female inquiring whether or not L.S. received a foot spa.  L.S. could not recall any further details about the conversation.

65.     L.S.'s primary care physician is through the Visiting Physician Association (VPA) located in St. Louis, MO and her current physician is Ben Swink. Previous physicians through VPA were Julie Fultz and Bernard Miller.  Someone from the VPA visits L.S. about once per month for her congestive heart failure and high blood pressure. L.S. takes medication for both conditions. L.S. is not diabetic and does not have any problems with her feet other than some occasional swelling. L.S. advised the only time she had an issue with her feet was when she had a bunion removed.

66.     L.S. has never heard of a nurse practitioner named Shannon Scott. Medicare claims showed Shannon Scott prescribed the foot bath and prescription medication for L.S. Additionally, Medicare claims show GoLiveWell filled the prescription and mailed the foot bath and medication to L.S.

67.     On July 22, 2019, a special agent with the St. Louis HHS-OIG interviewed EMPLOYEE 1, who worked as a pharmacy technician at GoLiveWell from approximately August 2018 to December 2018.

68.     EMPLOYEE 1's duties included obtaining prescriptions from "sales representatives."  The sales representatives were not employees or contractors of GoLiveWell. EMPLOYEE 1's primary responsibility included filling prescription orders. The prescriptions came from email and/or through file sharing services. Initially, GoLiveWell used Google Drive, but later switched to Drop Box. None of the pharmacy techs, including EMPLOYEE 1, had their own email address at GoLiveWell.  EMPLOYEE 1 believed only Michael McCormac and Mark Schumacher, Lead Pharmacist, had their own personal email at GoLiveWell.  There was a general

GoLiveWell email account used for communication with the sales representatives, but P.L.B could not recall the address.

69.     The emails sent by sales representatives contained the prescriptions and sometimes additional documentation from the doctors. EMPLOYEE 1 printed the orders and put them in bins that were color coded. EMPLOYEE 1 was not certain but believed GoLiveWell's point of sale software was called "Computer Rx." After receiving the order electronically, EMPLOYEE 1 would run the name of the drug through Computer Rx to see if the patient's insurance covered the drug and determined the amount of the co-pay. EMPLOYEE 1 was responsible for calling the doctors only if there was some sort of problem with the order, such as the drugs were not covered or the instructions on the prescription were unclear.

70.     When EMPLOYEE 1 first began working at GoLiveWell, the sales representatives would work with the doctors to obtain prescriptions. EMPLOYEE 1 believed the doctors in question were the customers' actual physicians because he would sometimes have to call the prescribers. The prescriptions were typically for pain creams and other topical products such as Lidocaine, Doxepin, and Calcipotriene.

71.     During EMPLOYEE 1's employment, several insurance plans, including CVS and Optum, conducted audits of GoLiveWell during the end of September 2018. EMPLOYEE 1 was not familiar with the specific areas of concern in the audits, but knew it generally involved coverage of certain drugs. EMPLOYEE 1 recalled a conversation he had with Schumacher during one of these audits. Schumacher told EMPLOYEE 1 that GoLiveWell was being audited regarding Doxepin and instructed EMPLOYEE 1 "don't even run it through." EMPLOYEE 1 took Schumacher's instructions to mean he was not supposed to check on the coverage of Doxepin and do not fill the order for that specific drug at the time.

24

72.     EMPLOYEE 1 noticed a change in the prescription orders received at GoLiveWell sometime in November-December 2018. EMPLOYEE 1 noticed when he called patients, they did not recognize the name of the prescriber.  Initially, EMPLOYEE 1 was instructed to just cancel the order when this occurred, but the orders subsequently changed.  Someone in GoLiveWell management, EMPLOYEE 1 could not recall specifically, instructed him to fill those orders regardless of the patient not knowing the prescriber. Around the same time period, EMPLOYEE 1 overheard McCormac reassuring Schumacher that the drug orders were legitimate.  McCormac told Schumacher that GoLiveWell was recording the patient calls in which they agreed to receive the drugs. EMPLOYEE 1 did not know who was speaking with the patients on the recordings. Out of curiosity, EMPLOYEE 1 listened to one of the recorded conversations via an audio file attached to an email. GoLiveWell was not the party recording patient calls and GoLiveWell obtained the recorded calls from elsewhere. EMPLOYEE 1 could only presume the recorded calls were provided by the "sales representatives."

73.     Just prior to EMPLOYEE 1's departure from GoLiveWell, he heard about GoLiveWell obtaining orders for foot soak medications, but never filled an order. EMPLOYEE 1 believed Schumacher and his wife, Mary Schumacher, a pharmacy technician, dealt primarily with the foot bath orders. EMPLOYEE 1 witnessed a few boxes go out with the foot bath prescription medications.

74.     On August 2, 2019, special agents with St. Louis FBI and St. Louis HHS-OIG interviewed EMPLOYEE 2, a former GoLiveWell pharmacy technician. EMPLOYEE 2 worked at GoLiveWell part-time, four (4) days a week from August 2018 until May 2019. Mark Schumacher was the lead pharmacist at GoLiveWell, while Michael McCormac appeared to be the sole owner of GoLiveWell.

25

75.     EMPLOYEE 2's responsibilities at GoLiveWell were to get the prescription orders from an email account, print out the prescription, determine whether the pharmacy had the requested drugs, and fill the prescription.  GoLiveWell received the prescriptions via email from telemedicine companies.  EMPLOYEE 2 advised there were a lot of telemedicine companies emailing prescriptions to GoLiveWell.  It was the telemedicine companies that contacted the patients.  EMPLOYEE 2 did not recall any names of the telemedicine companies.

76.     EMPLOYEE 2 advised the telemedicine companies had their own unique email address in which they faxed prescriptions to GoLiveWell.  Although the prescriptions were faxed, the order was received via email at GoLiveWell.  Once the email was received at GoLiveWell, the pharmacy technician printed out the prescription.  The telemedicine companies used email and faxes in order to communicate with GoLiveWell. GoLiveWell had patient information in their system from the telemedicine companies.  The GoLiveWell computer system would auto-populate the patient information if a prescription had been previously filled for the person. The ordering physician's name was included in the prescription emailed from the telemedicine company.

77.     Sometime in February-March 2019, GoLiveWell began receiving a lot of prescriptions for foot baths. There were three (3) specific drugs related to the foot baths which included Vancomycin (capsules), Clindamycin Phosphate (bottle), and Ketoconazole (cream). Additionally, a plastic foot spa (tub) and instructions for the foot baths were included. EMPLOYEE 2 estimated approximately sixty percent (60%) of GoLiveWell orders were the drugs for foot baths.

78.     In May 2019, EMPLOYEE 2 approached McCormac and requested time off to start working full-time elsewhere during the summer months. McCormac explained GoLiveWell's business had slowed and there were not many prescriptions being ordered.  EMPLOYEE 2 heard

about insurance audits taking place at GoLiveWell but did not know the specifics. As a result of the decrease in business, EMPLOYEE 2 was not needed any longer at GoLiveWell and her employment was terminated.  McCormac told EMPLOYEE 2 he would call her to return as a pharmacy technician if business increased.

### Analysis of GoLiveWell Payments to "Marketing" Companies

79.     Based on a review of its bank records, GoLiveWell paid a significant amount of money to marketing companies. For example, through August 2019, GoLiveWell paid approximately $775,000 to Marvel Marketing Group and approximately $10,500 to Invictus Ventures, LLC, entities previously identified in this Affidavit. Other entities, not previously identified in this Affidavit, but believed to be marketing companies include approximately $510,000 in payments to TB Interest, LLC, approximately $88,000 paid to YS Marketing, and approximately $46,000 paid to Global Med Marketing. Additionally, through August 2019, GoLiveWell paid approximately $104,400 in wire transfers to marketing companies, or representatives thereof, in which the words "leads" or "telemed" appeared in the memo of the transactions.  $77,650 of the above referenced payments to TB Interests, LLC have "lead" or "telemed" referenced in the wire transaction records.

80.     Based on my training and experience, GoLiveWell's payments to these "marketing companies" are bribes and kickbacks that GoLiveWell was paying to receive "leads" that would enable the pharmacy to bill Medicare and Medicaid for expensive prescription drugs in the names of these Medicare and Medicaid patients referenced in the leads.  EMPLOYEE 1 advised GoLiveWell obtained prescriptions from sales representatives.  The sales representatives were not considered employees and/or contractors of GoLiveWell.  EMPLOYEE 1 advised one of the companies in which the GoLiveWell sales representatives worked with was "Marvel"

(Marvel Marketing Group) which was based in Florida. EMPLOYEE 1 recalled two (2) head representatives from Marvel Marketing Group visiting the GoLiveWell offices. As mentioned previously, GoLiveWell paid Marvel Marketing Group approximately $775,000.00 for "leads" and more specifically prescriptions to bill the insurance companies for the high priced prescription drugs. Former employees nor financial analysis revealed any indication that the "marketing companies" were performing traditional marketing/advertising services for GoLiveWell. More specifically, EMPLOYEE 1 advised GoLiveWell received prescriptions from the marketing companies which constitutes an illegal kickback via the payment from GoLiveWell to the marketing companies.

Summary of GoLiveWell Payments to Marketing Companies

| Marketing Company | Payment by GoLiveWell (Total) |
|---|---|
| Marvel Marketing Group | $774,601.15 |
| TB Interests LLC | $509,919.28 |
| YS Marketing | $87839.28 |
| Global Med Marketing | $46,499.98 |
| Landfill 2 Inc. | $24,400.00 |
| DCX Management Marketing | $23,725.70 |
| Resolute Consulting Group | $16,924.12 |
| Inferno Marketing | $15,039.50 |
| Physicians Select Marketing | 11,250.00 |
| Spantel Marketing Group | 4,840.00 |
| Bobby Lide | $2,000.00 |
| United Marketing Group | 1,303.93 |
| Kramer Madison | 375.00 |
| **Total** | **$1,518,717.94** |

## Investigation by HHS-OIG, Hartford, CT Field Office

81.     The Hartford Field Office of HHS-OIG conducted a complaint investigation of

GoLiveWell in May 2019. The investigation was initiated after Hartford HHS-OIG received

complaint information from a former employee of Telemedicine Company 1. This affidavit does

not use the real name of Telemedicine Company 1 because it is the subject of an active criminal

investigation in Philadelphia.  The complaint was initially made to the Connecticut Department

of Public Health (DPH). During the course of the investigation, numerous interviews with

Connecticut Medicare recipients who had been solicited and mailed pain prescriptions via the

mail from GoLiveWell were conducted.

       82.    On April 30, 2019, a special agent with the Hartford HHS-OIG interviewed D.M.,

an Advanced Practice Registered Nurse (APRN), working in the nursing field for approximately

twenty-two (22) years.  In October 2018, D.M. was seeking part-time employment to make

additional income.  D.M. applied and was hired for a nurse practitioner position by Telemedicine

Company 1. D.M. was required to obtain her APRN license in Connecticut. D.M. was under the

impression she was going to be seeing patients via telemedicine in Connecticut and Louisiana,

where she was already licensed. D.M. signed collaboration agreement in both Louisiana and

Connecticut in April 2019. Soon thereafter, D.M.'s point of contact (POC) for the telemedicine

company, K.C., indicated D.M. had patients assigned to her in the company's portal. D.M. told

K.C. that she did not feel comfortable seeing patients until receiving malpractice insurance.

       83.    A few weeks later and prior to receiving malpractice insurance, D.M. decided to

log into the portal out of curiosity. After logging in, D.M. noticed several of her patients in

Connecticut had been "approved." When D.M. clicked on a patient's name, a corresponding

prescription had been dated and written using D.M.'s electronic signature, which she had

previously provided to Telemedicine Company 1. D.M. estimated that Telemedicine Company 1

had authorized twenty-to-thirty prescriptions as if she had actually written them without her

knowledge since December of 2018. A majority of the prescriptions were for "foot soak capsules."

84.     D.M. never heard of GoLiveWell. Pharmaceutical claims data and photographs of the prescription drug packages in the possession of Medicare recipients interviewed by the Hartford HHS-OIG agents revealed D.M. was listed as prescribing provider and GoLiveWell was the pharmacy that filled the prescriptions.

85.     On May 14, 2019, special agents with the Hartford HHS-OIG interviewed K.L., an APRN who briefly worked for Telemedicine Company 1. On June 17, 2019, K.L. forwarded an email to the Hartford HHS-OIG agents, which she had received on May 15, 2019 from Telemedicine Company 1 employee K.C. (identified above). The email distribution list includes several individuals believed to have prescribed foot soak medications that were ultimately dispensed by GoLiveWell. One of these individuals is Jessica Bruns, an out-of-state health care provider and prescriber that was identified in earlier paragraphs of this Affidavit.

86.     The email distribution list also includes several of the providers identified in Paragraph 33 (Top 10 Prescribing Providers since January 1, 2019 at GoLiveWell); specifically, Nichole Pridemore, Yulunda Faison-Oyebanji, Kelly Bowman, Ingrid Estephan, Beth Anne Robinson, and Jennifer Hook. An email provided to the Hartford HHS-OIG agents by D.M., originally sent to her by K.C. on January 6, 2019 included Michael Boswell in the distribution list. Boswell is also among the list in Paragraph 33. In all, these emails indicate that seven (7) of the (10) providers referenced in Paragraph 33 are affiliated with Telemedicine Company 1.

87.     On May 9, 2019, special agents with the Hartford HHS-OIG interviewed V.H., a Medicare beneficiary, living in Manchester, Connecticut. V.H. does not go to the doctor more

than once or twice per year for a physical. V.H. has a personal assistant, who comes to clean her apartment and help with grocery shopping.

88.     V.H. does not have any foot pain, but did receive a foot-soaking machine in the mail. V.H. did not know where the device came from and had not seen or spoken to a doctor prior to receiving the device. In addition to the device, V.H. received prescriptions, including foot cream that came in a large box from FedEx or UPS. V.H. believed she received a telephone call regarding the foot soaking device and the prescriptions but could not recall from whom. V.H. told the individual on the phone she did not have foot pain, but the caller told V.H. to "keep it in case you need it" referring to the foot soaking device and prescriptions. The same caller also asked if V.H. used a cane or walker, to which she stated she did not.

89.     Interviewing agents took photographs of the foot-soaking device and prescription medication. The labels on the medications listed GoLiveWell as the pharmacy. V.H. re-emphasized she uses CVS Pharmacy in Manchester, CT and does not have a primary care physician.

90.     On May 14, 2019, special agents with the Hartford HHS-OIG interviewed L.F., a Medicare beneficiary. L.F. reported he had been in an automobile accident approximately three (3) years ago in which he injured his foot. L.F. completed a six-day inpatient stay at St. Francis Hospital in Hartford after having foot surgery due to an infection. L.F. completed his inpatient stay on May 12, 2019 and returned home. L.F. has not had any other issue with his feet. Recently, L.F. received a phone call from an unknown male who asked if L.F. had any foot problems and if he needed or wanted a "foot machine." The caller went on to tell L.F. that he did not have to pay for the machine and L.F. agreed to have it sent to his apartment.

91.     L.F. received a foot soak machine as well as foot soak capsules, liquids, and lotions he was supposed to add to water and use with the foot soak machine. The items were sent to his house. L.F. denied ever hearing of GoLiveWell and said that all of his prescriptions get filled at Arrow Pharmacy inside St. Francis Hospital.  Interviewing agent showed L.F. a photograph of D.M., the ordering advanced practice registered nurse. L.F. stated he did not recognize the person in the photograph. L.F. advised he always sees a doctor in person and not over the phone or using a computer. Claims data and the label on the prescription indicated GoLiveWell was the pharmacy and D.M was the ordering provider.

92.     On June 4, 2019, L.F. telephoned the Hartford HHS-OIG special agent to advise he had received a telephone call from an unidentified female asking if he needed more "foot bath supplies." L.F. informed the female he did not need any more foot bath supplies. L.F. provided the telephone number, 844-896-2456, in which the female contacted him.  The search results of the telephone number indicated the number was associated with GoLiveWell.

93.     On May 14, 2019, a special agent with the Hartford HHS-OIG interviewed M.C., a Medicare beneficiary. M.C. advised his primary physician is Dr. Yekta, located in East Hartford. Sometime in April 2019, M.C. started seeing a podiatrist, Dr. Jeffrey Martone (Dr. Martone) due to pain in the arches of his feet and difficulty walking. Dr. Martone ordered x-rays and prescribed medication which seemed to be helping. M.C. is prescribed medication for high blood pressure and high cholesterol. M.C. obtains his prescriptions from the CVS across the street from his residence.

94.     M.C. recalled receiving several telephone calls from an unknown caller asking if he needed a foot soak machine and medication for his feet. M.C. was unsure how the caller obtained his telephone number, but the caller continued calling and asking if he needed the

items. M.C. returned home one day and saw a note from FedEx on his door. The delivery man returned later the next day and M.C. signed for the package which contained a foot soak machine, along with liquids and pills to put in the foot soak water. Additionally contained in the package were two (2) different ointments for foot pain. M.C. did not know from where the items came.

95.    M.C. has never heard of D.M., APRN, nor has he ever seen her for medical appointments. Interviewing agents showed M.C. a photo of D.M. and he advised "I don't know who the hell she is." M.C. has never heard of GoLiveWell and advised interviewing agents, a second time, the only pharmacy he obtains prescriptions is the CVS across the street from his residence.

96.    M.C. gathered five (5) prescription bottles which he received with the foot soak machine. M.C. informed interviewing agents there were several more boxes of the medications that came with the foot soak machine in his apartment. M.C. estimated he had received fifteen (15) boxes of Vancomycin. Interviewing agents accompanied M.C. back to his apartment to view the medications. After viewing all of the boxes received in the mail, interviewing agents took photographs of all the prescriptions. The labels on the prescription boxes listed D.M. as the ordering provider and GoLiveWell as the pharmacy.

97.    On May 14, 2019, special agents with the Hartford HHS-OIG interviewed R.R., a Medicare and Medicaid beneficiary. R.R. is a diabetic and has pain in one of his feet. R.R.'s primary care physician is Dr. Yongho Son Minale (Dr. Minale) of Plainville, Connecticut. R.R. sees Dr. Minale every four (4) months and is the only physician R.R. sees for his medications. R.R. receives his prescriptions from Beacon Pharmacy in Bristol, CT.

98.     R.R. was not prescribed medication for his foot pain, but did receive two (2) foot soaking devices and medications in the email.  R.R. never saw a doctor prior to receiving the devices and/or medication.  R.R. could not recall where the devices/medication came from.  In addition to the foot soaking devices and medication, R.R. also received several medical braces.

99.     Interviewing agents requested to see the items received in the mail.  R.R. was not familiar with D.M. and/or GoLiveWell.  R.R. received telephone calls about the foot soaking machines, medications, and braces.  The caller asked if R.R. had any pain, but did not indicate whether or not they were a physician.  Interviewing agents took photographs of the foot baths and medications.  The labels on the prescription boxes listed D.M. as the ordering provider and GoLiveWell was the listed pharmacy.

### Medicare Complaint

100.    HHS-OIG maintains a 'hotline' telephone and e-mail system where beneficiaries and providers can report Medicare fraud. Through this system, HHS-OIG received multiple "hotline" fraud complaints from medical providers about GoLiveWell, as well as other pharmacies across the United States that were using the same prescription drug-ordering providers.

101.    One such complaint, dated May 30, 2019, was made by a licensed nurse practitioner hired by Telemedicine Company 1 to digitally sign pre-filled prescriptions. The complaint, B.P., reported nurse practitioners were hired to evaluate patients for cancer genetic and pharmacogenetics testing.  Before being trained, B.P. began getting notifications for "foot soaks" (aka, foot baths). B.P. advised pharmacies seek out patients with diagnoses of diabetic neuropathy, foot ulcer, etc. A pre-filled prescription is sent to B.P. through Telemedicine Company 1's portal and B.P. is supposed to digitally sign off on the prescription.

102. B.P. advised large amounts of Vancomycin tablets and Clindamycin topical solution, daily for 90 days, is typically being prescribed to patients, and those drugs typically cost approximately $3,000 to $5,000/month. B.P. advised there is no assessment and no documentation that accompany the foot bath prescription to be signed. B.P advised he had received pre-filled prescriptions from the following pharmacies: Apogee Bio Pharm, JD Pharmacy, Incline Pharmacy, Llewlynns, and GoLiveWell. B.P. advised he signed only one prescription thinking it was a training exercise, but realized it was not, and emailed his clinical director not to process the prescription. B.P. "googled" some of these "no-name" pharmacies and advised it looks like their business model is "just finding old people, sending them a shit-ton of prescriptions in the mail." As a result, B.P. opted out of Telemedicine Company 1 and digitally signing prescriptions.

**Investigation by the Ohio Attorney General – Medicaid Fraud Control Unit**

Interview of R.W.

103. On July 16, 2019, a special agent with the OH AG – MFCU interviewed R.W., a Medicaid beneficiary. R.W. advised he randomly received a package through the mail from GoLiveWell. The package contained two (2) bottles of pills and one (1) tube of cream. R.W. advised the label of the medication had the name of his primary care physician (PCP) provider, S.P., a nurse practitioner. R.W. advised he had never spoken to S.P. about the prescription he had received through the mail. R.W. assumed S.P. had prescribed them because S.P.'s name was on the label.

104. R.W. advised he had used the two (2) bottles of pills and took the bottles to his local Rite Aid pharmacy to get a refill. The Rite Aid refused to fill the prescription of Chlorzoxazone because the prescription cost more than $1,000.00 and CareSource would not pay

for the prescription to be filled.    R.W. advised he was never contacted by GoLiveWell prior to receiving the box of prescriptions in the mail nor had he ever spoken to someone at GoLiveWell after receiving the box. R.W. advised he only received the one box in the mail from GoLiveWell.

Interview of S.W. re: R.W.

105.    On July 16, 2019, a special agent with the OH AG – MFCU interviewed receptionist, S.W., in the Medical Records Department Office of Metro Health, Cleveland, OH. S.W advised she could verbally confirm if patients were seen at MetroHealth on particular dates of service and if the patients had been written a prescription.   S.W. advised patient, R.W. was seen by S.P. on January 18, 2019. S.W. advised R.W. was not prescribed anything during his visit with his medical provider. Billing data shows GoLiveWell billed CareSource for Calcipotriene Cream and Chlorzoxazone. The prescription written date was January 24, 2019 with the prescriber being S.P.

Interview of S.C

106.    On July 16, 2019, a special agent with the OH AG – MFCU interviewed S.C., a Medicaid beneficiary. S.C. advised he received a telephone call from a pharmacy asking if he had any pain. S.C. advised he told the caller he had back pain, and the pharmacy offered to send him pain cream. S.C. advised he had to provide the name of his primary care physician, R.A. to the pharmacy caller. S.C. received one (1) package from the pharmacy containing multiple tubes of pain cream. Billing records show GoLiveWell billed CareSource one (1) time for a thirty (30) day supply of Doxepin HCL cream. S.C. advised he used all of the pain cream, but never received any more cream in the mail. S.C. never spoke to his doctor about the pain cream.

107.    The claims data show Le Thu as the prescribing provider of the Doxepin. S.C. advised Thu was not his primary care provider and Thu did not prescribe the pain cream. S.C.

advised he had been seen by Thu at the Cleveland Clinic when S.C. had to have a trach put in his neck to drain fluids.

Interview of J.R. re: E.H.

108.   On July 16, 2019, a special agent with the OH AG – MFCU interviewed J.R., a medical provider in Independence, OH. Interviewing agent explained to J.R. that he was attempting to confirm a prescription billed for patient E.H. that had a written date of January 16, 2019. J.R. reviewed his patient chart for E.H. and advised the closest visit date he had for E.H. was on January 25, 2019, and no prescription was written. Interviewing agent reported to J.R. that a claim was billed for E.H. with J.R. as the ordering provider for a prescription of Chlorzoxazone. J.R. went through every page of E.H.'s patient chart and there was no documentation for a prescription of Chlorzoxazone. J.R. advised there would be no reason he would not have documentation for a prescription he wrote for a patient.

Interview with M.M. re: A.A.

109.   On July 16, 2019, a special agent with the OH AG – MFCU interviewed M.M., a medical provider in Cleveland, OH. Interviewing agent explained to M.M. that he was attempting to confirm prescriptions written to patient A.A. Clams data show M.M. was the ordering provider for prescriptions of Calcipotriene Cream on October 16, 2018, November 19, 2018, as well as prescriptions of Chlorzoxazone on October 16, 2018, November 19, 2018, and December 18, 2018.

110.   M.M. pulled up A.A's electronic medical record on the computer and advised A.A's last visit was on June 26, 2018.  M.M. advised she never wrote the prescriptions described by interviewing agent. M.M. advised she was able to see that A.A. had been to the emergency room (E.R.) next door in November and December of 2018 for ear aches. M.M. advised A.A.

was not prescribed the previously mentioned prescriptions on those E.R. visits as well. M.M advised she had never heard of GoLiveWell and all of A.A.'s prescriptions are sent to the local CVS pharmacy.

## Computers As Instruments of Criminal Offenses

111.    As a result of the investigation, Affiant knows GoLiveWell utilizes an electronic pharmacy records system which is Windows-based.  The software used is Computer Rx and is able to monitor prescriptions, track inventory, and run reports.  Computers are used in the regular course of its business operation, and the computers located within the business premises at the pharmacy likely contain information related to the potential violations of law referenced herein.

112.    Witnesses have confirmed using computers during the course of their job duties, including the use of e-mail and a computerized pharmacy point of sale software system. Additionally, records reviewed during the course of the investigation confirms the use of e-mail by pharmacy employees, pharmacists, telemedicine companies, and McCormac. GoLiveWell's computer system consists of one server located at the 13035 Olive Boulevard, Suite 210, Creve Coeur, Missouri 63141 address.

113.    At least one computer is visible through the window of GoLiveWell.  Further, Affiant has learned the pharmacy maintains at least four (4) terminals throughout the rooms at the pharmacy that are connected to the server.

## Considerations Regarding Computer Equipment

114.    As detailed above, there is probable cause to believe that evidence of the commission of the criminal offenses described herein will be contained in computer equipment, including at least one computer, located at the premises to be searched.

115.    Affiant knows that computer hardware, software, and electronic files may be

important to a criminal investigation in two distinct ways: (a) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (b) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of the crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime.

116.    FBI employs personnel with specialized knowledge, training, and experience relating to computer and digital evidence (hereafter, "computer forensic personnel"). Based on my knowledge, training and experience, and the knowledge, training and experience of other agents and investigators with expertise in computer and electronic/digital evidence, Affiant is aware of the following:

a.   Hardware - Computer hardware includes all computer equipment capable of being linked together in a local area network (LAN) (to include any equipment which has remote access capabilities) including all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b.   Software - Computer software is digital information which can be interpreted by a computer and any related components to direct the way they work. Software is stored in electronic, magnetic, optical, or digital form. It commonly includes programs to run

operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interprets, and communications programs.

c.  Documentation - Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d.  Passwords and Data Security - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming codes. Data security hardware may include encryption devices, chips, or circuit boards. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e.  Computer hardware and computer software may be utilized to store information or data in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. Such media includes, for example, fixed hard drives and removable hard drive cartridges and cards, laser disks, tapes, floppy disks, memory sticks, CD ROMs, DVDs, and any other media capable of storing magnetic coding.

f.  Addresses:  Every device on the Internet has an address that allows other devices to locate and communicate with it. An Internet Protocol ("IP") address is a unique number that identifies a device on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Most Internet service providers ("ISPs") control a range of IP addresses. When an ISP or other provider uses dynamic IP addresses, the ISP assigns one of the available IP addresses in the range of IP

addresses controlled by the ISP each time a user dials into the ISP to connect to the Internet. The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period. Once the user disconnects, however, that IP address becomes available to other customers who connect at a later time. Thus, an individual customer's IP address normally differs each time he dials into the ISP. A static IP address is an IP address that is assigned permanently to a given user or computer on a network. A customer of an ISP that assigns static IP addresses will have the same IP address every time. Other addresses include Uniform Resource Locator (URL) addresses, such as "http://www.usdoj.gov," which are typically used to access web sites or other services on remote devices. Domain names, host names, and machine addresses are other types of addresses associated with Internet use.

g.  Log files are computer files that contain records about system events and status, the identity and activities of users, and anomalous or unauthorized computer usage. Names for various log files include, but are not limited to: user logs, access logs, audit logs, transactional logs, and apache logs. Logs can also maintain records regarding the identification of users on a network, as well as Internet sites accessed by the computer.

h.  Electronic mail ("e-mail") is a popular form of transmitting messages and/or files in an electronic environment between computer users. When an individual computer user sends e-mail, it is typically initiated at the user's computer, transmitted to a mail server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An e-mail server may allow users to post and read messages and to communicate via electronic means.

117.   Based upon my training and experience and information related to me by Agents and others involved in the forensic examination of computers, Affiant knows that computer data can be stored in a variety of systems and storage devices including hard drives, floppy disks, compact disks, magnetic tapes, and memory chips.  Affiant also knows that during a search of a

41

business, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Volume of evidence:  Computer storage devices (like hard disks, diskettes, tapes, CDs, DVDs, and thumb drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

c. Computer files or remnants of such files can be recovered months, even years, after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is

not allocated to an active file or that is unused after a file has been allocated to a set of block storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

d.  Searching computer equipment for evidence described can require a range of computer forensic analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. Data analysis may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain, "opening" or reading the first few "pages" of selected files to determine their contents, scanning for deleted or hidden data, searching for key words or phrases ("string searches").

e.  Accordingly, Affiant requests permission to seize the computer hardware, and associated peripherals, which are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site analysis of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence. HHS-OIG's computer forensic personnel will attempt to make duplicate images of the computer storage equipment at GoLiveWell Pharmacy, precluding the need to seize the equipment. In the event that this is not possible, or will require extensive time on site, Agents will seize the equipment, computer forensic personnel will image the storage equipment at FBI Office, and Agents will return the equipment within fourteen (14) days of any search.

43

## Confidentiality of Seized Records

118.    Because some of the documents to be seized contain protected health information, affiant will put into place the following procedures. The records will be stored in a locked room and only persons involved in the investigation will be given access to the protected health information. It is anticipated that only law enforcement agents and investigators, government attorneys, and government experts will be given access to the records during the investigation.  If there is a trial, the records will be protected from inadvertent disclosure with standard measures, such as using initials for patients, protective orders, redaction, or filing materials under seal.

## Access to Seized Records

119.    GoLiveWell may contact Affiant at (314) 589-3216 to request access to the seized documents and to have all or some of the documents copied at their expense if any of the records are needed for ongoing health care treatment of patients.

## Conclusion

120.    Based on the foregoing, there is probable cause to believe that GoLiveWell

submitted false and fraudulent claims to Medicare, Medicaid and private insurance in violation

of the law, and furthered a scheme to defraud Medicare, Medicaid, and private insurance. Based

on the investigation to date, there is also probable cause to believe the evidence, fruits, and

instrumentalities of the crimes set forth herein may be located inside the premises identified as

GoLiveWell Pharmacy at 13035 Olive Blvd. Suite 210, Saint Louis, MO 63141.


9-23-2019

DATE

Michael J. Badolato
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this 23 day of September, 2019.

Patricia L. Cohen
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

# ATTACHMENT A

Photographs of GoLiveWell's office at 13035 Olive Blvd. Suite 210 St. Louis, MO 63141





## ATTACHMENT B

## Items and Documents to be Seized

For the time period for violations occurring during March 17, 2017 through the date of

the execution of any warrant, any and all evidence, fruits, and instrumentalities relating to or

involving evidence of violations of 18 U.S.C. §§ 371 (conspiracy); 1341 (mail fraud); 1343 (wire

fraud); 1347 (healthcare fraud); 1349 (conspiracy to commit mail fraud, wire fraud, and

healthcare fraud); as well as violations of Title 42, United States Code, Section 1320a-

7b(b)(2)(A the Anti-Kickback Statute),  including but not limited to the following specific

items:

1.      Prescription drug dispensing records, including prescriptions, RXD reports, and

supporting documentation that involve or refer to the following drugs:  Vancomycin,

Clindamycin, Ketoconazole, Fluocinonide, Doxepin, Lidocaine Calcipotriene, Diclofenac,

Clobetasol, Hydrocortisone, and Chlorzoxazone. For the purposes of this Affidavit, "prescription

drug dispensing records" means any evidence that refers or relates to prescription drugs

dispensed by GoLiveWell, including but not limited to any prescription drug dispensing records

for any beneficiary covered by any publicly funded health care benefit program, including

Medicare or any State's Medicaid program.


2.      Prescription drug billing records related to any prescription drugs referenced in #1 of this

attachment. For the purposes of this Affidavit, "billing records" means any evidence that relates

to any billing, claims, requests or demands for payment from any publicly funded health care

benefit program, including Medicare or any State's Medicaid program, including any evidence

related to the collection or attempted collection of copayments from customers or program

beneficiaries.


3.      Any records related to contracts, arrangements, payments, correspondence, or

transactions between GoLiveWell and any sales representative; marketing company, including

but not limited to RXD, Invictus Ventures, LLC, Marvel Marketing, DCX Management

Marketing, Global Med Marketing, Inferno Marketing, Kramer Madison, Landfill 2, Physicians Select Marketing, Resolute Consulting Group, Spantel Marketing Group, TB Interests, United Marketing Group, and YS Marketing; or any representative thereof, including but not limited to Bobby Lide, Neil Williams and Sean Beck.

4.      Any records related to contracts, arrangements, payments, correspondence, or transactions between GoLiveWell and any telemedicine company, including but not limited to Ostara Healthcare (aka Digital Noema); Camelot Health Care, LLC; and Encore Telemedicine (aka Locum Tenens USA) or any representative thereof.

5.      Personnel records for present and former employees, independent contractors and consultants of GoLiveWell, including employment applications, resumes, transcripts, degrees, licenses, certifications, payment records, salary records, compensation records, time sheets, or other documents reflecting who is or was working for or receiving income at GoLiveWell.

6.      Records reflecting communication between GoLiveWell and any agency or representative of the federal government, any state government, any prescription drug plan, any Pharmacy Benefit Manager (PBM), any Pharmacy Services Administrative Organization (PSAO) or commercial insurance plan regarding the prescription drugs referenced in paragraph 1, including any contracts, provider enrollment documentation, provider manuals, provider applications, correspondence, communications, letters, educational material, regulatory bulletins, etc.

7.      Records reflecting communication between GoLiveWell and any customer, customer's family member, or any representative of a customer regarding any prescription drugs identified in paragraph 1 above that were billed or sent to the customer, including any recordings of conversations between GoLiveWell and said individual(s).

8.      Records reflecting communication between GoLiveWell and any marketing company, telemedicine company, prescribing provider, or any representative of the prescribing provider, including any recordings of conversations between GoLiveWell and said individual(s).

9.      Any financial institution records showing GoLiveWell receiving funds, either directly or indirectly, from any public health care benefit program (including Medicare, any State's Medicaid program, or CHAMPUS/Tricare) or patient of those programs regarding the distribution of any of the prescription drugs referenced in paragraph 1 above.

10.     Any financial institution records that show GoLiveWell paying marketing companies, telemedicine companies, sales representatives, or any third party for leads or other information leading to their dispensation of any prescription drugs referenced in paragraph 1 above, including Bank of America and Silvergate Bank.

11.     All business, financial and operational records including all correspondence, memoranda, contracts, agreements, reports of conversation, receipts, invoices, notes, calendars, appointment books or logs, patient appointment books or logs, wage and payroll records/filings, call logs, diaries, ledgers, journals, chart(s) or accounts, receipts and income records, check stubs or registers, financial performance estimates or projections, profit and loss statements, statements of operations, federal and state income tax returns (and related estimates), bank and other financial records/statements, wire transfer records, powers of attorney, sureties and vouchers.

12.     Any records regarding the issues discussed above in paragraphs 1-11 of this attachment that can be found on any computers inside the office of GoLiveWell (and any related storage media), and:

     a.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

     b.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

     c.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

     d.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

     e.      evidence of the times the COMPUTER was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

g.  contextual information necessary to understand the evidence described in this attachment.